# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.

SUPERIOR COURT
C.A. NO.

17   0545

---

KIMBERLY BYFIELD

     Plaintiff

v.

WELLS FARGO BANK, N.A.

     Defendant

**VERIFIED COMPLAINT
AND JURY DEMAND**

---

## NATURE OF THE CASE

1.    Plaintiff Kimberly Byfield ("Byfield") brings this action against Wells Fargo Bank, N.A. ("Wells Fargo"), the owner and servicer of her mortgage, seeking to enjoin the foreclosure set for May 15, 2017. The foreclosure is unlawful because: (1) Wells Fargo violated the right-to-cure statute, G.L. c. 244, § 35A by sending pre-foreclosure notices that do not "strictly conform" with the model notice promulgated by the Division of Banks, as mandated at 209 C.M.R. § 56.04; and (2) the mortgage contains a defective jurat which renders the mortgage not legally recordable under G.L. c. 183, § 29. Under Massachusetts law, Byfield's mortgage must be treated as unrecorded and outside the chain of title, and Wells Fargo is therefore not entitled to conduct a non-judicial foreclosure under G.L. c. 244, § 14.

1

## PARTIES

2.      Plaintiff Kimberly Byfield ("Plaintiff" or "Byfield") is a natural person residing at 59 Lyman Road, Milton, Norfolk County, Massachusetts 02186.

3.      Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national bank with principal offices located at 101 N. Philips Avenue, Sioux Falls, South Dakota 57104. Wells Fargo owns and services Byfield's mortgage.

## COMMON FACTS

4.      Byfield is the owner of the property at issue, located at 59 Lyman Road, Milton, Norfolk County, Massachusetts.

5.      Byfield purchased the property for $468,000 in 2007. The property is registered land with her deed is recorded in the Norfolk Registry of Deeds, document number 1,139,461.

6.      Byfield purchased the property in part by using a loan from World Savings Bank in the amount of $374,400, secured by a mortgage on the property. The mortgage is recorded in the registry, document number 1,139,462.

7.      Byfield's mortgage loan is a "Pick-a-Payment" loan, originated by World Savings Bank on October 5, 2007. World Savings Bank was acquired by Wachovia, which was later acquired by Wells Fargo. The "Pick-a-Payment" loans contained a negative amortization feature which permitted borrowers to pay less than the interest-only amount due, causing the principal balance to increase over time.

8.      World Savings Bank merged with Wachovia Bank, N.A., which later merged with Wells Fargo Bank, N.A.

9.      Wells Fargo is the current holder, as successor by merger, of Byfield's note and mortgage.

10.     Byfield lives in the home with her children, including her 22-year old son Avery, who is fully and permanently disabled.

11.     Byfield is the full-time care manager for Avery, who suffers from spastic quadriplegia, the most severe form of cerebral palsy, resulting from a brain injury sustained due to improper vaccination when he was just one year old. Avery lives permanently with Byfield.

12.     Avery is totally wheelchair bound, and requires full hand-over-hand assistance with all activities of daily living. He is non-verbal and receives nourishment through a feeding tube. He is cared for by Byfield, other family members, and paid caregivers who care for him in his home.

13.     Byfield's home has been extensively renovated and modified to accommodate Avery's accessibility and therapy needs.

14.     The main entrance to the home was widened to accommodate double doors, and an access ramp was added. The walkway was redone with non-slip materials.

15.     The front porch was enclosed, new windows and heating were added, and the floor was raised to create level access from the main house so Avery would have a comfortable seating area to relax with his caregivers and watch activity in his neighborhood.

16.     All barriers were removed from the first floor, all doorways were widened, and all floors were brought to the same level to allow Avery's wheelchair to navigate the

3

first floor unobstructed. All doors were equipped with offset hinges for safe opening and closing.

17.    A bedroom and bathroom were added to the basement so that Byfield's first floor bedroom could be converted to a therapy room for Avery. The door was widened, a therapy table and physical therapy area were added, and a lift system was installed to the ceiling. A window was removed and a new door added to an additional ramp for outside access directly from the therapy room.

18.    Avery's bedroom was extensively renovated to accommodate his hospital bed and storage needs, and a lift system was installed to the ceiling to assist caregivers in transitioning Avery to and from his bed.

19.    The first floor bathroom was gutted and rebuilt to be fully accessible, with a walk in shower, safety bars, hand held shower, special heating, and accessible sink and toilet.

20.    The back porch of the home was redone completely with composite decking and raised to be level with the inside floors so that Avery can spend time outdoors with family.

21.    The electrical system of the home was upgraded to accommodate a generator that would keep critical systems running during any power outage.

22.    A shed was added to the backyard for storage of Avery's medical equipment and supplies and to house the generator.

23.     Avery receives settlement income of approximately $300,000/year, 100%

of which is deposited into the Avery JC Byfield OBRA 93 Trust ("the Trust") to fund his

ongoing care.

24.     The Trust pays Byfield $25.00/hour to provide direct care and support to

Avery and to supervise his other caregivers.

25.     The Trust also contributes over $3,200 per month for Avery's benefit

towards Byfield's household expenses.

26.     Byfield's home has been extensively modified to accommodate Avery's

specific accessibility needs, and forced relocation would have a significant and debilitating

impact on his care and well-being.

27.     Byfield can afford the property and qualifies for a loan modification under

the Home Affordable Modification Program, but her application to Wells Fargo for

assistance was mishandled, her income was improperly calculated, and her request for

loan modification was improperly denied.

28.     Wells Fargo is aware that the home has been specially modified for

Avery's accessibility and therapy needs, and is aware that Byfield has enough income to

qualify for a loan modification; nonetheless, Wells Fargo denied Byfield's application

based on net present value – meaning that Wells Fargo has claimed that it may be more

profitable to foreclose than to modify.

29.     Wells Fargo has scheduled a foreclosure sale of Byfield's property for

May 15, 2017.

## THE HAMP LOAN MODIFICATION PROGRAM

30.     The Home Affordable Modification Program ("HAMP") is a federal

loan-modification program started in the wake of the 2008-2009 economic meltdown and

foreclosure crisis. *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 228-230 (1st Cir. 2014).

The goal of HAMP is to provide homeowners with affordable mortgage payments.

HAMP does not forgive principal and requires homeowners to repay all mortgage arrears

and escrows for taxes and insurance. *Id.* Under HAMP, banks and mortgage servicers

enter into lucrative contracts in exchange for their agreement to modify loans according

to HAMP guidelines.

31.     Wells Fargo has a $6.4 billion taxpayer-funded federal HAMP contract

under which it has promised that it "shall" provide loan modifications to eligible

borrowers. The contract is available online via publication on government website,

available at http://www.treasury.gov/initiatives/financialstability/programs/

housingprograms/mha/Documents_Contracts_Agreements/093010wellsfargobanknaSP

A(incltransmittal)-r.pdf.

32.     The guidelines for HAMP are contained in a handbook called the Making

Home Affordable Program Handbook for Servicers of Non-GSE Mortgages, Version 4.3

(the "MHA Handbook"). The MHA Handbook guidelines are incorporated by reference

into the HAMP contracts. *See* Servicer Participation Agreements at p. 2, § 1.B (stating

"Servicer shall perform the Services described in . . . the guidelines and procedures

issued by the Treasury . . . ."). The MHA Handbook is available online via publication on

government website, incorporated by reference, available at

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_43.
pdf.

33.    Under HAMP, homeowners' monthly mortgage payments, inclusive of

escrow, are reduced to 31% of their gross monthly income. This is accomplished by a

combination of steps that reduce the mortgage's interest rate, extend the term, and

provide a principal forbearance. *See* MHA Handbook, Ch. II, § 6.3 (describing this

"waterfall" succession of steps required to achieve a modified payment).

34.    The procedure for a modification is as follows. First, past-due amounts are

capitalized, resulting in a new principal balance. Second, the interest rate is reduced by

increments of 0.125% to a possible floor of 2.00%. Third, the term of the loan is extended

to a maximum of 40 years. And finally, if necessary to reach the Target Payment, a

servicer will forbear up to 30% of the recapitalized principal balance, putting it "on the

back of the loan" so that the borrower does not pay interest on it. The homeowner must

still repay this amount when the loan matures, or when the loan is refinanced or the house

sold. In this way, a homeowner who can afford his or her mortgage may resume payments

with a modified monthly payment amount. *See* MHA Handbook, Ch. II, § 6.3.1.

35.    Courts have consistently held that even though there is no private right of

action under HAMP, a violation of HAMP that is unfair or deceptive does create a viable

claim for relief under the Massachusetts Consumer Protection Act, G.L. c. 93A, § 2.

*Morris v. BAC Home Loans Servicing, L.P.*, 775 F. Supp. 2d 255 (D. Mass. 2011); *Leon v.

Ocwen Loan Servicing*, No. CV 16-10402-LTS, 2016 WL 4575314, at *2–3 (D. Mass. Sept.

1, 2016); *Sullivan v. Bank of New York Mellon Corp.*, 91 F. Supp. 3d 154 (D. Mass. 2015).

7

## WELLS FARGO'S HISTORY OF VIOLATING HAMP
## AND OTHER FORECLOSURE LAWS

36.     Wells Fargo has a public record of foreclosure offenses, having been

subject to action by state and federal regulators. As recently at May 26, 2016, Wells Fargo

was fined $70 million by the Office of the Comptroller of the Currency for failure to

correct deficiencies identified in its foreclosures. *See In the Matter of Wells Fargo Bank,*

*N.A.*, OCC Consent Order, No. AA-EC-2016-30, available at http://www.occ.gov/news-

issuances/news-releases/2016/nr-occ-2016-61b.pdf. Federal regulators have cited it for

"unsafe and unsound practices in residential mortgage servicing and in [its] initiation and

handling of foreclosures." *See In the Matter of Wells Fargo Bank, N.A.,* OCC Consent

Order, No. AA-EC-11-19 (Apr. 13, 2011), available at http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47k.pdf.

37.     The Massachusetts Attorney General has sued Wells Fargo for widespread

acts involving foreclosure conducted in an unfair or illegal manner. *See Commonwealth v.*

*Wells Fargo Bank, N.A., et al.*, No. SUCV2011-04363 (Mass. Super.) (complaint filed on

Dec. 1, 2011).

38.     Wells Fargo has also entered into a consent judgment with the attorneys

general of 49 states and the federal government. The consent judgment is incorporated by

reference, and is available online through government website at

https://d9klfgibkcquc.cloudfront.net/Consent_Judgment_WellsFargo-4-11-12.pdf.

Under the settlement, Wells Fargo agreed that it "must document its right to foreclose

on a borrower." *See* Servicing Standards, National Mortgage Settlement, incorporated by

reference, and available online through government website at

8

http://www.atg.wa.gov/uploadedFiles/Home/About_the_Office/Cases/National_Mort
gage_Settlement/Servicing%20Standards%20Highlights.pdf.

      39.      One expert suggests that the reason mortgage servicers like Wells Fargo

refuse to modify eligible homeowners' loans, despite their legal obligation to do so under

HAMP, is that foreclosure is often more profitable than modification, since servicers, not

the investors, receive the initial share of the foreclose sale proceeds, even when a house is

auctioned for less than is owed. *See* Diane E. Thompson, *Why Servicers Foreclose When*

*They Should Modify and Other Puzzles of Service Behavior: Servicer Compensation and Its*

*Consequences*, National Consumer Law Center, October 2009, at 26 ("In a foreclosure,

there is no question that the servicer gets reimbursed off the top for all of its advances and

costs.").

## WELLS FARGO'S WRONGFUL DENIALS OF
## BYFIELD'S LOAN MODIFICATION APPLICATIONS

      40.      Byfield fell behind on the mortgage in 2012 due to financial hardship

related to loss of income.

      41.      Byfield applied for loan modification assistance through the HAMP

program.

      42.      Byfield's applications appear to have been denied due to Wells Fargo's

miscalculation of her income and the improper discounting of monthly contribution

payments that the Trust makes to Byfield on behalf of Avery Byfield. Even though Byfield

has notified Wells Fargo about this error, Wells Fargo's lack of follow-through and

disorganization has prevented a resolution.

      43.      In May 17, 2016, Wells Fargo denied Byfield's application for

modification, and stated in its denial letter that it calculated her gross monthly income to be $6,210. This letter specifically identified income as the sole determinative issue, explicitly stating that the negative NPV calculation had no bearing on the decision – **"please understand the reason we are unable to offer you this program is not related to your NPV evaluation."**

44.     Through counsel, Byfield submitted a new loan modification application in November, 2016. Subsequent to this most recent review, Wells Fargo correctly calculated Byfield's income to be $7,850/month – an amount which would qualify her for a HAMP Tier 1 modification; however, Wells Fargo denied Byfield. This time, the denial was not based on income, but solely on the NPV calculations, stating "we are unable to modify your mortgage based on the results of your net present value (NPV) evaluation."

45.     Had Byfield's income been calculated correctly, however, she would have been provided with a loan modification under HAMP. Under HAMP, the unpaid payments would have been capitalized and added onto the principal so that they could be paid off over time. Her mortgage payment would have been reduced to approximately $2,434 per month pursuant to the HAMP requirement that the monthly payment be reduced to 31% of the borrowers' gross monthly income. *See* MHA Handbook, Ch. II, § 6.3 (describing the "waterfall" of steps required to achieve a modified payment at 31% of gross monthly income). As such, Byfield's income showed her at all relevant times to be capable of paying a monthly mortgage payment.

46.     As a result of Wells Fargo's actions, Byfield has suffered damages including mortgage arrears that would not have accrued had her loan been timely

10

modified, negative credit reporting, loss of the benefit of a decreased interest rate, and personal injury damages including physical manifestations of stress, anxiety, worry and confusion, including headaches and sleeplessness.

47.     Furthermore, as explained below, the right-to-cure notice sent to Byfield pursuant to G.L. c. 244, § 35A does not comply with the model notice promulgated by the Division of Banks, 209 C.M.R. § 56.04. Pursuant to that law, Wells Fargo is not permitted to foreclose until a compliant notice is sent to her and she is provided the statutory amount of time to attempt to cure the default.

48.     Left with no alternative, Byfield is now forced to file this action to save her home.

## COUNT I:
### Invalid Right-to-Cure Notice in Violation of G.L. c. 244, § 35A

49.     The preceding allegations are hereby incorporated by reference.

50.     On September 16, 2014, Wells Fargo, sent a right-to-cure notice to Byfield pursuant to G.L. c. 244, § 35A (hereinafter "§ 35A" and the "§ 35A Notice"). (**Exhibit 1.**)

51.     The right-to-cure statute, § 35A, is designed to give a mortgagor a fair opportunity to cure a default before the debt is accelerated and before the foreclosure process is commenced through invocation of the power of sale. *U.S. Bank Nat. Ass'n v. Schumacher*, 467 Mass. 421, 430-31 (2014). Under § 35A, a mortgagee may neither accelerate the loan nor foreclose, unless certain definite disclosures are provided in the § 35A Notice. G.L. c. 244, § 35A(g) ("The mortgagee, or anyone holding thereunder, shall

not accelerate ... until at least 150 days after the date a written notice is given by the

mortgagee to the mortgagor.").

52.    Under Division of Banks ("DOB") regulations, a § 35A Notice may not

deviate in any way from the model notice promulgated by the DOB pursuant to 209

C.M.R. § 56.04 (the § 35A Notice "must strictly conform to the following [model

notice]"). *See also* 209 C.M.R. §§ 56.03(1) and (2) (both stating that the right-to-cure

notice must "strictly conform[]" to the DOB's model form). (Exhibit 2.)

53.    Though "strictly conform" is not defined in the regulation, the word

"strict" means that it must be "Absolute; requiring no showing of fault." *See* Black's

Law Dictionary. *See also Com. v. Bell*, 442 Mass. 118, 124 (2004) ("We derive the words'

usual and accepted meanings from sources presumably known to the statute's enactors,

such as their use in other legal contexts and dictionary definitions.").

54.    If the § 35A Notice does not strictly conform, then a homeowner may file

an action in Superior Court to enjoin the foreclosure. *Schumacher*, 467 Mass. at 422, n. 4,

432-33 (Gants, C.J., concurring).

55.    Among the requirements of G.L. c. 244, § 35A are that the property owner

must be given a date that is "150 days" from the date of the notice, and that the property

owner must be given the specific "NAME OF [the] PAYMENT CONTACT," not just

their department. 209 C.M.R. § 56.04. The notice sent to Byfield in September 2014 was

defective in both these requirements.

56.    First, the required 150-day deadline to cure the mortgage was

impermissibly expanded by five days. The model § 35A Notice requires providing a date

"**150 days** from the date of this notice." *See* 209 C.M.R. § 56.04 (emphasis added). Here,

however, Byfield was given "**155 days** from the date of th[e] notice" to pay the past-due

amount. (Emphasis added.) (**Exhibit 1.**) Thus, the notice unacceptably provided a date

that was five days later than required and did not "strictly conform" to § 35A.

57.    Second, the notice did not include the name of the person to whom

payment should be made. The model notice promulgated by the Division of Banks states

that the relevant section of the § 35A Notice should state:

Make your payment directly to:

[INCLUDE THE NAME OF PAYMENT CONTACT,
DEPARTMENT AND ADDRESS at the MORTGAGEE'S
LOCATION].

209 C.M.R. § 56.04 (emphasis added). Here, the notice to Byfield entirely omitted the

"name" of any person to whom payment should be made, stating:

Make your payment directly to:

Wells Fargo Home Mortgage, MAC X2302-041
1 Home Campus
Des Moines, IA 50328 (1-800-282-3451)

(**Exhibit 1.**) Thus, the § 35A Notice also failed to "strictly conform" to the model notice.

58.    In accordance with the DOB's requirement that the notice "strictly

conform" to the model notice, the § 35A Notice sent to Byfield failed to so conform, and

no foreclosure may take place.

59.    The appropriate action for Byfield to take is to file this action in Superior

Court and seek an injunction, as explained by Chief Justice Gants:

As the court notes, see ante at note 4, where a homeowner who is facing
foreclosure claims that the mortgage holder has failed to provide timely
and adequate written notice of the right to cure the default in payment of
the mortgage, in violation of § 35A, the homeowner may file an equitable
action in Superior Court seeking to enjoin the foreclosure.

*Schumacher*, 467 Mass. at 432 (Gants, C.J., concurring).

## COUNT II:
### Violation of G.L. c. 244, § 14

60.    The preceding allegations are hereby incorporated by reference.

61.    Under Massachusetts law, a mortgage must have a proper

acknowledgement in order to be recorded:

No deed shall be recorded unless a certificate of its acknowledgement or of the
proof of its due execution, made as hereinafter provided, is endorsed upon or
annexed to it, and such certificate shall be recorded at length with the deed to
which it relates ....

M.G.L. c. 183, § 29. *See also Bank of Am. v. Casey*, 474 Mass. 556, 561 (2016).

62.    There is no valid acknowledgement of Byfield's signature on the mortgage.

The mortgage acknowledgement states that it was the signature of a third party, possibly

the seller of the property, whose name is referenced in the handwritten jurat. (**Exhibit 3.**)

63.    Even if a defective mortgage is somehow accepted for recording by the

registry of deeds, as happened here, it must be treated as though it is unrecorded and

outside the chain of title. *See In re Mbazira*, No. 13-16586-WCH, 2015 WL 1543908

(Bankr. D. Mass. Mar. 31, 2015) ("[I]f a [mortgage] is improvidently recorded due to a

defective acknowledgement, the court must honor [G.L. c. 183, § 29,] by adopting a

14

fiction that the [mortgage] is unrecorded and outside the chain of title"); *Bank of Am. v. Casey*, 474 Mass. at 566.

64.     Because Byfield's signature was not acknowledged as required under G.L. c. 183, § 29, it is "unrecorded and outside the chain of title." *Bank of Am. v. Casey, supra.* The mortgage may thus not be foreclosed on because there is no validly recorded mortgage to foreclose on under G.L. c. 244, § 14.

65.     Wells Fargo received notice of this defect but has nonetheless scheduled a foreclosure sale of Byfield's home for May 15, 2017, in violation of G.L. c. 244, § 14.

## COUNT III:
### Declaratory Judgment that Wells Fargo Has No Standing to Foreclose

66.     The preceding allegations are hereby incorporated by reference.

67.     Under the declaratory judgment statute, the Superior Court may "make binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred in any case in which an actual controversy has arisen and is specifically set forth in the pleadings." G.L. c. 231A, § 1.

68.     Here, there are two controversies between Byfield and Wells Fargo related to its standing to foreclose, as explained above and as incorporated by reference, namely, that Wells Fargo failed to strictly comply with G.L. c. 244, § 35A, and that the mortgage is not validly recorded, therefore Wells Fargo is prohibited from exercising non-judicial foreclosure under the power of sale, G.L. c. 244, § 14.

## COUNT IV:
### Negligent Misrepresentation

69.     The preceding paragraphs are hereby incorporated by reference.

70.     Wells Fargo services the mortgage on Byfield's home.

71.     In the course of servicing Byfield's mortgage, Wells Fargo supplied false information for the guidance of Byfield. Specifically, Wells Fargo told Byfield that it would consider her appeal, and that it would provide her with a loan modification if her income showed her to be eligible.

72.     Byfield justifiably relied on Wells Fargo's statements as it held itself out to be complying with loan modification guidelines, HAMP, and state and federal law.

73.     Nevertheless, Wells Fargo failed to consider Byfield's appeal or to provide her with the loan modification for which she qualified.

74.     As incorporated by reference from above, Byfield has been damaged by Wells Fargo's actions and misrepresentations.

## COUNT V:
### Violation of the Consumer Protection Act, G.L. c. 93A

75.     The preceding paragraphs are hereby incorporated by reference.

76.     Byfield lives in her home, the property at issue, as her principal residence.

77.     Wells Fargo is engaged in trade or commerce in Massachusetts, by, inter alia, servicing mortgages on Massachusetts residents' homes.

78.     Byfield sent Wells Fargo a demand letter pursuant to G.L. c. 93A describing Wells Fargo's unfair and deceptive business practices, her damages, and requesting a reasonable settlement offer. **(Exhibit 4.)**

79.     Wells Fargo responded to the c. 93A demand on October 26, 2016 but made no offer of settlement. **(Exhibit 5.)**

16

80.   As incorporated by reference above, Byfield has been damaged by Wells Fargo's unfair and deceptive business practices.

81.   Additionally, Wells Fargo acted unfairly and deceptively by failing to consider Byfield at all for an MAP2R modification, as is required under the terms of Wells Fargo's class-action settlement with the Attorney General of California. *In re Wachovia Corp. Pick-a-Payment Mortgage Mktg. & Sales Practice Litig.*, No. M:09-CV-2015-JF, 2010 WL 5559767, at *1 (N.D. Cal. Dec. 16, 2010).

82.   Under the terms of the class-action settlement, Wells Fargo is required to consider all "Pick-a-Payment" loans that are either in default or imminently in danger of default, and which do not qualify for HAMP, under its proprietary MAP2R modification program, but did not consider Byfield's loan for this program.

83.   Because Byfield's loan was already in default, she was eligible for consideration as a Class C Plaintiff under the settlement agreement, and Wells Fargo was required, under the terms of the agreement, to consider her for the MAP2R modification, and to clearly communicate to her that she was eligible to be considered for this modification option as a qualifying member of the class action and clearly explain any denial for the program.

84.   The settlement agreement required Wells Fargo to advise borrowers of their eligibility under the settlement and to provide class members with clear, written explanations of modification denials. *Foley v. Wells Fargo Bank, N.A.*, 109 F. Supp. 3d 317, 326 (D. Mass. 2015).

85.     Wells Fargo sent Byfield denials of her modification application and appeal on May 17, 2016, June 8, 2016, July 11, 2016, December 5, 2016, December 7, 2016, and January 27, 2017. Nowhere in any of these denials was any reference made to Byfield being either eligible for or considered for the MAP2R modification program.

86.     Wells Fargo's failure or refusal to consider Byfield for the MAP2R modification pursuant to the class action settlement was unfair and deceptive, in violation of G.L. c. 93A. *Id.*

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Kimberly Byfield respectfully requests that the Court provide the following relief:

a)      Judgment in her favor and against Defendants on all counts;

b)      Injunctive relief restraining the foreclosure of her home;

c)      An award of actual and compensatory damages, costs, interest, and attorney's fees;

d)      An order that Defendants reconsider Byfield for a loan modification; and

e)      All other relief to which she may be entitled in law or equity.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted,

Plaintiff,
Kimberly Byfield
By counsel,


Josef C. Culik (BBO #672665)
Kristin Thurbide (BBO #694840)
CULIK LAW PC
225 Franklin St., 26th Floor
Boston, MA 02110
(617) 830-1795
jculik@culiklaw.com
kthurbide@culiklaw.com

May 4, 2017

19

## VERIFICATION OF COMPLAINT

I, Kimberly Byfield, plaintiff in the foregoing action, hereby depose and state that I have read and subscribed to the foregoing complaint, and that the facts set forth therein are true and correct based on my personal knowledge, and no material facts have been omitted therefrom.

Signed under the penalties of perjury,

Kimberly Byfield